## AYERS v. MACOUGHTRY.

No. 979.  Opinion Filed June 27, 1911.

Rehearing Denied September 26, 1911.

(117 Pac. 1088.)

1. **ANIMALS—Vicious Dogs—Damages—Evidence.** Plaintff brought action to recover for injuries inflicted by a vicious dog. In his petition he pleaded damages in the sum of $150, expenses incurred by him in traveling from Muskogee, Okla., to Austin, Tex., to take the Pasteur treatment as a preventative of hydrophobia. The defendant answered, denying the incurring of this expense, and that it was necessary. **Held,** that the evidence shows the same to have been incurred, that it was necessary, and a proper item of damages.

2. **ANIMALS—Vicious Dogs—Liability of Owner—Notice of Viciousness.** The keeping of a dog, with knowledge on the part of the owner or his wife that the same had bitten or attempted to bite one or several persons prior to the time of the attack upon the plaintiff, is evidence sufficient to support a verdict, rendered on an instruction declaring defendant liable, if he had notice, either actual or constructive, of the vicious and dangerous character of the dog.

3. **TRIAL—Instructons—Weight of Evidence.** Defendant submitted to the jury the following interrogatory: "Did the plaintiff, immediately after he was bitten by the dog, say to defendant: 'Don't worry about it, Captain, it don't amount to anything; it was my own fault' "—and the jury replied: "Not proven." In this connection, defendant requested, and the court refused, an instruction relating to the presumption obtaining in reference to the weight to be given affirmative and negative evidence. **Held,** not error.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; John H. King, Judge.*

Action by Paul B. Macoughtry against C. C. Ayers. Judgment for plaintiff, and defendant brings error. Affirmed.

*Cook & deGraffenried,* for plaintiff in error.

*S. V. O'Hare* and *Farrar L. McCain,* for defendant in error.

DUNN, J. This case presents error from the district court of Muskogee county, to which it was transferred after statehood, having been originally brought in the United States Court for

the Western district of the Indian territory, at Muskogee. Plaintiff in error, as defendant, was sued by defendant in error for damages which he alleged were suffered by him in consequence of being bitten by a vicious dog kept and owned by the defendant.

The averments of the petition are substantially as follows: That defendant resided in the city of Muskogee, and kept at his house a vicious and dangerous dog, which was accustomed to bite mankind. That, knowing of this propensity on the part of the animal, its owner had allowed it to go at large on and about the property of people residing in that neighborhood. That, on or about the 15th day of July, 1906, plaintiff became a tenant of a residence adjoining the property of the defendant, and that the defendant neglected to restrain his said dog in any manner whatsoever, and allowed it to leave its owner's premises and to go on to and around plaintiff's residence, and while there, on or about the 27th day of August, 1906, the said dog made a violent attack upon plaintiff, bit and wounded him in his ankle, leg, thigh, and arms, by reason of which plaintiff became sick and disabled, and suffered great bodily pain for over four weeks, to his damage in the sum of $2,250. That by reason thereof plaintiff was detained from his labor, at a loss of $100. That by reason of the fact that the bite of a dog having rabies or hydrophobia is infectious and fatal to the life of a man being so bitten, and by reason of the fact that it was impossible at the time to ascertain whether or not a dog has rabies or hydrophobia, plaintiff suffered great mental pain, and was put in fear of his life by reason of his apprehension of said wounds causing the said disease. Tha. by reason of this fact plaintiff was compelled to undergo the Pasteur treatment, being the only known preventative for hydrophobia, and was put to great expense for medical treatment and attention, and the expense incident thereto, in the sum of $150.

To the complaint the defendant filed an answer admitting that he owned a dog at the date named in the complaint, but denied that the dog was vicious and dangerous, or, if it was, that he knew it, and denied that he permitted said dog to run

at large in the city of Muskogee and go at will upon the property and private residences of others adjoining his home. He disclaimed any knowledge of whether the dog had bitten or wounded plaintiff in the manner alleged, and as to whether or not plaintiff became sick and disabled and suffered as he averred, and therefore demanded strict proof of the same. He denied that plaintiff was damaged in the sum of $2,500, or any other sum, by reason of the bite of the dog; denied that plaintiff was unable to perform his accustomed work for four weeks, and that he was damaged in the sum of $100 thereby. His answer then continued as follows:

"Further answering herein, defendant says that it was wholly unnecessary for the plaintiff to take Pasteural treatment in order to prevent hydrophobia from the bite of said dog, and denies that plaintiff was damaged in the sum of $150, as actual damages for the taking of the Pasteur treatment."

On the trial before a jury, a verdict was returned in favor of plaintiff in the sum of $500, to review which the action has been lodged in this court.

Counsel argues, first, that the court erred in admitting the testimony concerning plaintiff's expenses to Austin, Tex., occasioned by taking the Pasteur treatment, his pain and suffering while under the same, and the loss of time while going to, staying, and returning from, Austin, which consumed 27 or 28 days, for the reason, as it is averred, the expenses were not necessary, and that the reasonableness of the charges was not established. It will be noticed from the pleading that the issue tendered in regard to the Pasteur treatment was, not that the charges were unreasonable, but that it was unnecessary for plaintiff to take the treatment, and also that plaintiff was not damaged in the sum of $150, which he alleged he had paid as expenses for the medical attention and expense incident to taking the said treatment. The question, then, on the issues as made by the pleadings, is whether the treatment was necessary, and whether it was in fact taken. The evidence on the issue thus tendered is quoted at length in the brief of plaintiff in error as follows; plaintiff testifying:

"Q. Now, tell the jury how long you experienced pain and suffering from these wounds altogether. A. Well, the actual pain of the wounds, this perhaps lasted only a few days. Q. Well, how many, Mr. Macoughtry? A. Five or six, perhaps; but the ankle and knee joints were very stiff for over two weeks. Q. State whether or not you experienced any mental pain or anxiety. A. I was very apprehensible of the wounds. Always afraid of dog bites. Q. State what your apprehension was—in fear of taking the rabies? A. I was in fear of acquiring it; yes, sir. Q. Did that produce any mental anguish? A. Yes, sir; there was a good deal of anxiety, and I experienced it. Q. Now, after your treatments by Dr. Oldham, state whether or not you went under any other treatment. A. I took the Pasteural treatment at Austin, Tex. Q. When did you go to Austin after the bite? A. The day following. Q. What time? A. On the fast mail, I think it was. Q. State whether or not there was any pain connected with the taking of the Pasteural treatment. A. It is a very severe treatment, and causes a great deal of suffering and pain. Q. What was it occasioned you to go to Austin to take the treatment? A. The apprehension of taking hydrophobia from the dog bite. Q. Now, what, if any, expense did you incur by reason of this trip to Austin? A. About $150. Q. Does' that include your railroad fare? A. Yes, sir. Q. Now, how long were you absent from your duties on account of this? A. Practically a month. The treatment required 21 days, and there was the best part of two days, and some in going, and two days in coming back, and counting the days I was absent prior to my departure would make about 27 or 28 days. Q. What compensation did you receive per month during that time? A. One hundred dollars per month. Q. And you were absent about, you say, about 27 or 28 days? A. About that. Q. Now, did you pay anything to Dr. Oldham? A. Yes, sir; I paid for his services."

Dr. Oldham, plaintiff's attending physician, was introduced on behalf of plaintiff, and testified:

"Q. Doctor, in the case where a man has been attacked and bitten by a dog in three or four different places on his body, what would you say as to the necessity for that man taking the Pasteural treatment? A. The number of bites has nothing to do with it, and the Pasteural treatment in that case would be a prophylactic measure; in other words, a preventative from hydrophobia. Q. What do you say the necessity was in taking that

treatment? A. There may absolutely be no necessity, but to sat-isfy the patient's mind, and to preclude any after effects he might have, I would recommend the Pasteural treatment as a prophylactic treatment. Q. Now, explain that to the jury. A. That is a treatment in advance of a disease; treatment to pre-vent certain diseases. Q. Is it a preventative? A. It has proven so, as I understand it. The main benefit from Pasteural treat-ment is preventative. Q. State whether or not, in your opinion, it was advisable and necessary for Macoughtry to take the Pas-teural treatment? A. Well, I would like for him to divide that question. He asks two questions in one. I think it is advisable sometimes when it is not necessary. Q. Well, was it advisable or necessary? A. Yes, sir. Q. Did you charge Macoughtry anything for doctoring him? A. Yes, sir. Q. How much? A. I only treated him twice, and I charged him $5 for the time I first saw him and dressed him, and he was in the office the next day, and I charged him $1 for that treatment. It was $6, as my books show."

Cross-examination:

"Q. Doctor, Mr. McCain asked you if it was advisable or necessary to take the Pasteural treatment, and you answered, 'Yes.' What do you mean by that? A. I meant as a prophylactic measure. Q. Did you mean it was necessary. A. No, sir, ad-visable."

It is contended on the part of defendant that the foregoing evidence does not disclose that it was necessary that defendant incur the expense incident to going to Austin, Tex., to take the prophylactic treatment to relieve him of either the anxiety or the effect of rabies or hydrophobia from the wounds which had been inflicted by defendant's dog. It is true that neither the local physician who treated him nor plaintiff himself testified that it was necessary that he take this treatment, but we submit that plaintiff was not required to wait until rabies developed before he took those reasonable, precautionary measures which any in-telligent man would naturally take to relieve himself from the danger. Courts take judicial knowledge of the fact that small-pox is a terrible disease, whose ravages have sometimes swept away thousands of human beings in a few weeks. It is also known that a large number of the medical profession and peo-

ple generally consider vaccination a preventative of the disease, and of these facts courts take judicial knowledge. *In the Matter of·Viemeister,* 179 N. Y. 235, 72 N. E. 97, 70 L. R. A. 796, 103 Am. St. Rep. 859; *Commonwealth v. Pear,* 183 Mass. 242, 66 N. E. 719, 67 L. R. A. 935. Likewise it is a matter of general knowledge that one of the most horrible forms in which death can visit humanity is that of hydrophobia, and that this is incurred by being bitten by dogs which have it. The wounds in this case were inflicted in August, and everybody, even courts, take knowledge of the fact that any precaution which could be said to be advisable would, in view of the consequences which its omission might entail, be deemed to be reasonable and necessary. Knowledge that the Pasteur treatment is generally considered proper for the prevention of rabies or hydrophobia may be considered to be judicially known, without proof thereof; and a consideration of plaintiff's injuries and of the possible results, taken in connection with the issue made and the evidence introduced, are sufficient, in our judgment, to support the conclusion that the expenses incurred in taking the same were reasonable and necessary. The instruction which the court gave on this matter, and to which exception was taken, reads as follows:

"You are instructed that if you find for the plaintiff in this case you may return a verdict in such sum as you believe from the evidence will compensate him for the damages which he has sustained by reason of the injuries. And in determining said damages you may take into consideration the expenses which you believe from the evidence he has paid, incurred, or become liable for, medical and surgical services, if any, in consequence of being bitten by the dog, if he was so bitten; and in determining such amount you may take into consideration the apprehension of poisoning from the bite of said dog and the fear of evil results therefrom, and of the physical and mental suffering endured by him in consequence of being bitten by said dog."

In view of the issues, this instruction was not error.

A similar instruction was before the Supreme Court of Michigan, in the case of *Sherwood v. C. & W. M. Ry. Co.,* 82 Mich.

374, 46 N. W. 773, the salient portions thereof reading as follows:

"In estimating the compensatory damages in cases of this character, * * * the elements of damages which the jury are entitled to take into account consist of all effects of the injury complained of, consisting of personal inconvenience, the sickness which the plaintiff endured, the loss of time, all bodily and mental suffering, impairment of capacity to earn money, the pecuniary expenses, the disfigurement or permanent annoyance which is liable to be caused by the deformity resulting from the injury."

Of this the court said: "We see no error in this charge." In further considering the case, it developed that the plaintiff, was permitted to testify as to the costs and expenses of a trip which she made from Michigan to Indiana for medical treatment. The court under this instruction allowed plaintiff to recover for the entire expenses of the trip, her board and medical treatment for a period of six months, including board for her sister. The evidence introduced tended to show that the injuries received might be relieved by the treatment sought. The plaintiff suggested to her physician the taking of the treatment in question, and the evidence discloses that the advice which she received was that "it would be a good idea, and that it might improve her general health, and indirectly help the health of the muscles." The court, taking into consideration all of these matters, held that it could not be said that the expenditures under the circumstances were unreasonable, and said:

"It is further contended that the court erred in permitting the plaintiff to testify as to the costs and expense of her trip to La Porte, Ind., and the medical treatment which was given her at the time of her attendance there. The reason of this objection, stated by counsel, is that this treatment was not necessary or usual for an injury of this kind, and that, by permitting this testimony, the court allowed the jury to charge the defendant with the entire expenses of the trip, her board and medical treatment from December 5th until May 28th following, at the rate of $21.50 per week, including the board of her sister. * * * She was entitled, as a part of her damages, to recover whatever was a reasonable and necessary outlay in her attempt to

be cured of the injuries resulting from the negligence of the defendant. It cannot be said, under the circumstances, that this was an unreasonable expenditure."

An instruction for similar allowances was also considered by the Supreme Judicial Court of Massachusetts, in the case of *McGarrahan v. New York, etc., Ry. Co.,* 171 Mass. 211, 50 N. E. 610; the instruction being as follows:

"There is evidence in the case as to medical attendance. Dr. Coxwell told you the number of visits he had made to the plaintiff for the purpose of treating him. There is no evidence as to what the ordinary charge for such a visit is. There is no evidence as to what the charges of Dr. Coxwell ordinarily are. * * * I must assume that you have some knowledge in common with men in general as to the charges ordinarily made by physicians for attendance and services such as you find upon the evidence in this case have been rendered; and you may avail yourselves of that knowledge for the purpose of determining what sum the plaintiff should have by reason of the expense he has properly and reasonably incurred in endeavoring to effect a cure."

From the foregoing it will be noticed that the evidence did not disclose the amount of expense, as in the case at bar, but the appellate court, in passing on the verdict which was rendered under the same, speaking with reference to the duty of the jury in cases of this character, said:

"Jurors take with them their knowledge and experience of affairs, and are not only at liberty to use, but ought to use, that knowledge and experience in drawing conclusions from the evidence. Evidence that one who practices as a physician or surgeon attends a patient, and gives him professional assistance, justifies a finding that the services are rendered for a pecuniary recompense, to be paid by the patient."

In the case at bar, the specific amount was definitely set forth in the plaintiff's petition, proved by him on the trial, and the issue made on it was, not that it was an unreasonable charge, but that it was not made, and, if made, was unnecessary. Anyway, it would have added practically nothing to the knowledge possessed by any of us for plaintiff to have testified that the charge was reasonable. The force of the situation shows it to

be. Other cases in which the question has been considered and passed on in accord with our holding may be noted as follows: *Wallace v. Western North Carolina R. Co.,* 104 N. C. 442, 10 S. E. 552; *Hart v. Charlotte, etc., R. Co.,* 33 S. C. 427, 12 S. E. 9, 10 L. R. A. 794; *Indiana Car Co. v. Parker,* 100 Ind. 181; *Huizega v. Cutler & Savidge Lumber Co.,* 51 Mich. 272, 16 N. W. 643; *Evans v. McDermott,* 49 N. J. Law, 163, 6 Atl. 653, 60 Am. Rep. 602; *Lake Shore & M. S. Ry. Co. v. Frantz,* 127 Pa. 297, 18 Atl. 22, 4 L. R. A. 389. See, also, Baldwin, Personal Injuries, §437.

It is next contended that the court erred in rejecting certain relevant and material testimony duly offered by the defendant, which it is contended went to the point of showing defendant's knowledge of the vicious character of the dog. Plaintiff's petition alleged that the dog was vicious, and that the defendant knew about it. The defendant's answer denied that the dog was vicious and dangerous, and that, if it was, denied that he knew it. Quoting from the brief of the defendant, evidence on this point is shown to be as follows:

"Q. State whether or not, previous to the injury of the plaintiff, you had any notice of the dog making vicious attacks upon any one. A. I never had. Those cases where it had bitten people I did not regard as vicious, from circumstances under which they occurred. The dog, as I say, was a most affectionate dog, obedient dog, that I ever knew, except with his, what you might call peculiarities or eccentricities; and we always accounted for his disposition from the circumstances that he was raised from a puppy on human milk. Q. Now, what do you mean by his peculiarities? A. His peculiarities were that he would not submit to being hit; he would jump at you, and raise his bristles; and he had a very peculiar tail. It was very bushy, and yet when he was angry the hairs on that tail would all stand out; and his other peculiarities are that after you had given him something to eat you couldn't take that away from him. Q. You—would he compare in appearance with a bulldog? A. Oh. there was no resemblance between him and a bulldog except that he was a dog; but, so far as any similarity with a bulldog, any one that knew anything about a bulldog wouldn't class him with a bulldog in his appearance or actions. Q. Captain, did you have any no-

tice whatever of the matter detailed here this morning by the Smith girl as to how she had been bit? A. I know only of the Smith transaction only by information from my wife, and the Smith child is evidently mistaken. It didn't occur in that way. Q. I am not asking you whether you are contradicting her or not; I am asking you this, Did you have any notice that it occurred in the manner in which she detailed it here this morning? A. No, sir; my recollection is I didn't know of the Smith girl being bitten until a long time afterwards. Q. What was your information as to how the child was bitten? (Objection. Sustained. Defendant excepts.) Q. Did you ever notice the disposition of the dog to run out of the yard to bark at people, or make demonstrations as if he was going to attack them? A. He was very little addicted to that."

The error which is alleged to have been committed is that the defendant was denied the right to show his information as to how the Smith girl was bitten; it being made to appear that this information was to the effect that the Smith girl was interfering with the dog, trying to take its bone, and that the dog did not act viciously, but simply in defense of its food. It appears from the evidence that, including the plaintiff in this case, the dog had, to the knowledge of the defendant, on one pretext or another, bitten or attempted to bite five different persons. The defendant testified that he did not know much about the Smith girl circumstances, and that all that he knew of it was information given him by his wife. Conceding that the explanation which defendant sought to make of the occurrence was admissible and should not have been excluded, the verdict is abundantly supported by other evidence. The dog appears to have been of an extremely sensitive nature, which caused it to resent, by attacking people, what it deemed unwarranted interferences with its food or its rights. These peculiarities, or eccentricities, as they are denominated by the defendant, are accounted for by him on the theory that the dog was raised from a puppy on human milk. Defendant testified to facts showing that he had notice of these propensities, and from whatever cause they were occasioned, whether from feeding on human milk, from inherent viciousness, or otherwise, the keeping of the animal with such knowledge, and

permitting it to run at large, renders him liable for all damages which it might inflict. It is the keeping of the animal, with knowledge, either actual or constructive, of its dangerous or vicious propensities, which creates the liability. *Emmons et al. v. Stevane et ux.,* 77 N. J. Law, 570, 73 Atl. 544, 24 L. R. A. (N. S.) 458; *Grissom v. Hofius,* 39 Wash. 51, 80 Pac. 1002, 4 Am. & Eng. Ann. Cas. 125; *Robinson v. Marino,* 3 Wash. 434, 28 Pac. 752, 28 Am. St. Rep. 50; *King et ux. v. Muldoon,* 131 App. Div. 847, 116 N. Y. Supp. 308; *Boler v. Sorgenfrei et ux.* (Sup.) 86 N. Y. Supp. 180; *Barclay v. Hartman,* 2 Marv. (Del.) 351, 43 Atl. 174; *Fake v. Addicks,* 45 Minn. 37, 47 N. W. 450, 22 Am. St. Rep. 716; *Strouse v. Leipf,* 101 Ala. 433, 14 South. 667, 23 L. R. A. 622, 46 Am. St. Rep. 122; *Turner v. Craighead,* 83 Hun, 112, 31 N. Y. Supp. 369, affirmed in 155 N. Y. 631, 49 N. E. 1105, without opinion. Nor is it necessary that the dog's disposition or peculiarity be such as to render it liable to or inclined to bite all with whom it comes in contact; it being held in a number of cases that, if the dog had bitten one person prior to the injuries sued for, knowledge thereof is sufficient notice of his character to bind the owner. *Smith v. Pelah,* 2 Str. 1264, cited in the case of *Loomis v. Terry,* 17 Wend. (N. Y.) 496, 31 Am. Dec. 306; *Keenan v. Gutta Percha Mfg. Co.,* 46 Hun (N. Y.) 544; *Arnold v. Norton,* 25 Conn. 92; *O'Rourke v. Finch,* 9 Cal. App. 324, 99 Pac. 392. In the old case of *Smith v. Pelah, supra,* which has never been departed from, Lee, C. J., "ruled that if a dog has once bit a man, and the owner having notice thereof keeps the dog, and lets him go about or lie at his door, an action will lie against him at the suit of a person who is bit, though it happened by such person's treading on the dog's toes; for it was owing to his not hanging the dog on the first notice. And the safety of the king's subjects ought not afterwards to be endangered."

Counsel next object to the seventh instruction, wherein the court instructed the jury that, if it was satisfied that the defendant "was the owner of a vicious and dangerous dog, and that, either by actual or constructive notice, this fact was brought

home to him, then in that case your verdict should be for the plaintiff," etc.; the objection being that the instruction was erroneous, because the court went beyond the rule requiring the owner to have actual knowledge, thereby imposing an additional, unwarranted method by which he could be charged with knowledge, to wit, "constructive notice." In our judgment, the instruction was not erroneous. It has been held in numerous cases, that where knowledge was had of dangerous and vicious propensities of a dog by others of the owner's household, he was held to have the knowledge which they possessed. For instance, in the case of *Barclay v. Hartman, supra,* a wife's knowledge was sufficient to charge the husband with responsibility. Likewise, in the case of *Boler v. Sorgenfrei et ux., supra,* the knowledge of the wife was deemed sufficient. In the case of *King v. Muudoon, supra,* a complaint to the housekeeper of the defendant, who testified that she was in general charge of the place in the absence of the defendant, was held sufficient; and in the case of *Grissom v. Hofius, supra,* evidence that the watchman of the owner knew of the previous instances of the dog attacking and biting persons was sufficient to go to the jury upon the question of whether the owner knew or should have known of the vicious disposition of the dog. There was no error in the charge.

Under his fourth assignment, defendant argues that the court erred in its refusal to give a certain instruction on the weight to which affirmative, as contradistinguished from negative, evidence was entitled. The defendant submitted to the jury the following interrogatory: "Did the plaintiff, immediately after he was bitten by the dog, say to the defendant: 'Don't worry about it, Captain; it don't amount to anything; it was my own fault?'" To which the jury answered, "Not proven." It is the contention of counsel that the court should have instructed the jury that in the weighing of evidence the presumption is that ordinarily a witness who testifies to an affirmative is to be credited with preference to one who testifies to a negative, because he who testified to a negative may have forgotten a thing which did happen, while it is not possible to remember a thing

that never existed.    The refusal of such an instruction is not error.    See the following authorities:   3 Brickwood, Sackett, Instructions, §3303; *Chicago & Alton R. Co. v. Robinson,* 106 Ill. 142; *Louisville, New Albany & Chicago Ry. Co. v. Shires, Adm'r,* 108 Ill. 617; *Himrod. Coal Co. v. Clingan,* 114 Ill. App. 568.

No error having been made to appear, the judgment of the trial court is affirmed.

All the Justices concur.