## CASSIDY, Adm'x, v. HORNOR et al.

No. 10476—Opinion Filed June 13, 1922.

(Syllabus.)

### 1. Trusts—Constructive Trusts—Elements.

## 2. Joint Adventures—Acquiring Title to Property in Fraud of Associates—Constructive Trust.

## 3. Same.

## 4. Same—Fiduciary Relation of Parties.

## 5. Corporations—Capital Stock— Legality —Stock in Payment for Oil Leases.

An oil and gas corporation is not prohibited by section 39, art. 9, of the Constitution from issuing its stock in payment for oil and gas leases, provided the value of the leases equals the par value of the stock issued in payment therefor.

## 6. Corporations—Contracts Between Corporation and Officers—Validity.

A contract between a corporation and its officers is not void per se, but is merely voidable at the option of the corporation or its representatives, and such option must be exercised within a reasonable time under all the circumstances of the case.

Error from District Court, Logan County; John P. Hickam, Judge.

Action by C. C. Hornor against M. Cassidy and others. Judgment for plaintiff, and defendant M. Cassidy brings error. Affirmed.

Dale & Bierer and S. W. Hayes, for plaintiff in error.

D. A. Richardson and John Adams, for defendants in error.

NICHOLSON, J. This action was brought by C. G. Hornor, as plaintiff, against M. Cassidy, Alice-Kathryn Oil Company, a corporation, and J. R. Cottingham, as secretary of Alice-Kathryn Oil Company, as defendants, to require the Alice-Kathryn Oil Company to issue and deliver to the plaintiff five shares of capital stock of the Alice-Kathryn Oil Company of the par value of $500. From a judgment in favor of the plaintiff, the defendant M. Cassidy prosecuted this proceeding in error. After this proceeding was lodged in this court, M. Cassidy died, and said cause has been revived in the name of, and is now being prosecuted by, Alice M. Cassidy, administratrix of the estate of M. Cassidy, deceased.

The facts are fully stated in the findings of fact by the trial court, which are as follows:

"Upon the request of M. Cassidy, defendant, the court makes the following findings of fact and conclusions of law.

### "Findings of Fact.

"(1) The court finds that the plaintiff was, at the time when this action was commenced, and has been for many years, a practicing lawyer residing in the city of Guthrie; that plaintiff at the time when this action was commenced and prior thereto, had had experience in the organization of corporations and had also made a study and investigation of oil fields and the conditions under which oil deposits formed and accumulated, and that plaintiff had had experience with oil companies, in their organization and management and in prospecting for oil.

"(2) The court finds that the defendant M. Cassidy had resided in the city of Guthrie for many years and was in the habit of coming to the office of plaintiff and discussing topics in connection with oil and oil fields, and that at such time plaintiff was in the habit of discussing with said defendant the result of his reading upon the subject of oil and gas production, and that defendant believed that plaintiff possessed knowledge and experience in such matters of practical value.

"(3) That the Alice-Kathryn Oil Company was and is a corporation organized and existing under the laws of the state of Oklahoma, and that J. R. Cottingham was and is secretary of said corporation.

"(4) The court finds that sometime in the month of March, 1914, the defendant M. Cassidy went to the plaintiff's office and stated to plaintiff that he, Cassidy, had been advised by one C. M. Gould, formerly State Geologist for the state of Oklahoma, that one D. W. O'Hearn had been making surveys and investigations in the vicinity of Yale, Okla., and had there discovered a well defined anticline indicating the existence of an undeveloped oil field, and that said Gould had suggested to the said Cassidy that there was an opportunity to acquire some oil leases in that section and it looked like a favorable proposition to get in on to make some money. That said Cassidy stated to plaintiff that he

had an arrangement with the said Gould to go to Yale and look over the grounds there in company with the said O'Hearn; that the said Cassidy desired and requested the plaintiff to go along and look over said proposition in company with him and the said Gould, with a view of acquiring an interest therein, which said Cassidy said might be advantageous to plaintiff and to the said Gould and the said Cassidy. That plaintiff inquired the date when it was proposed to go to Yale, and that defendant stated the date, some days later, when the said Gould would come up from Oklahoma City, and it was proposed that plaintiff and said defendant should go from Guthrie on said day and meet the said Gould at the station of Fallis, on the line of the Missouri, Kan. & Texas Railroad and then proceed in company to Yale. That plaintiff stated that he was very much interested in the proposition and thought he would be able to go on the day in question. That defendant said he didn't want any uncertainty about the matter, but wanted it to be a distinct understanding that the parties were to go to Yale on the day stated, and said to plaintiff in words or substance, 'that this might be a big thing for us,' or 'it might mean a whole lot to us,' with other expressions of similar character and import; that plaintiff said he understood the matter very well and understood its importance and what it might signify and expected and intended to go. That defendant said he wanted to leave the matter in this shape so that there would be no contingency about keeping the appointment. That in this talk defendant stated in words or substance that Gould, meaning C. N. Gould, would be 'in this with us,' or 'in on the deal.' The court finds that the purpose of the defendant in coming to and desiring plaintiff to go to Yale on said trip was to interest plaintiff in this proposition in order to have the benefit of plaintiff's judgment and experience in looking over the ground and in any action that might be taken thereafter, and that it was the idea of defendant that plaintiff's knowledge and experience would be of value, both by reason of his knowledge of law and his experience in the formation of corporations, and also his knowledge of oil and gas and geology, all of which it was believed would be useful and valuable in passing upon the property and in carrying out any plan that might be formed to handle it; and the court further finds that there was nothing in the conversation or intentions of the parties, nor in fact, implying any employment of plaintiff as an attorney in a formal or technical sense, but that the purpose of defendant coming to plaintiff as aforesaid was to interest him in a joint venture in which the parties were to participate, and that any return which the plaintiff was to receive for what he did in the premises, was simply to be an interest or share in the venture. That there was nothing stated, implied, or intended in said conversation or arrangement that plaintiff was to be paid an attorney fee, or that plaintiff was to act in that sense and capacity. That it was simply a business venture in which plaintiff was to appear, if at all, as an actor and party in his own interest, he to contribute such advice and services as would be naturally expected in view of the knowledge and experience of plaintiff and his relation to the other parties.

"(5) The court further finds that a few days later the defendant Cassidy called plaintiff over the phone in the evening and stated that Mr. Gould had changed the day then fixed, viz., on or about the 3rd day of April, 1914; that plaintiff stated to defendant that he guessed that day would be all right, and that defendant again said that he didn't want any guessing about the matter, but wanted it to be definitely understood that the parties were to go to Yale on '' ~ day fixed and look the proposition over.

"(6) The court further finds that on or about the 3rd day of April, 1914, plaintiff and the defendant Cassidy went from Guthrie to Fallis and there met Mr. Gould, who had come up on the M., K. & T. train from Oklahoma City, that plaintiff was not acquainted with the said Gould, but that defendant Cassidy introduced plaintiff to said Gould, saying: 'This is Mr. Hornor who will be in with us on this matter,' in substance or effect making an explanation of this character.

"(7) The court further finds that the leases in question had been obtained from property owners near Yale by A. P. Crockett, an attorney of Oklahoma City, and that the said Crockett either owned or was in a position to control said leases. That the said Crockett and also the said O'Hearn were at Yale when plaintiff and defendant arrived there, and that it was then arranged for the parties, including the two geologists, O'Hearn and Gould, to go out and look the property over. That said parties went out in an automobile and went over the ground; that plaintiff had a sufficient knowledge of geology to go over the ground with said geologists and form an opinion of his own, based partly upon examination of the ground and partly upon talk with the geologists. That the said Gould confirmed the examination of said O'Hearn in regard to the existence of the anticline in question, and that plaintiff, from his own examination and knowledge, formed an opinion as to the existence of such anticline and was strongly and favorably impressed therewith and believed that it afforded an opportunity for the development of an oil field. That upon returning to Yale, plaintiff stated to said defendant Cassidy that he believed there was an anticline as located by the said O'Hearn, and believed that there was an opportunity to obtain leases that would be valuable, and in brief, that plaintiff was strongly and favor-

ably impressed with what he had seen. That upon returning to Yale, the parties met with A. P. Crockett, and after some general talk Mr. Crockett suggested that they go to his room at the hotel and talk business. That the said Crockett and plaintiff spent an hour or two going over the situation. That the defendant Cassidy was present, but took no part in the conversation, leaving this entirely to plaintiff. That plaintiff inquired of Crockett about the leases and about their terms and conditions, and desired to see and be furnished with the form of the lease that was used. That Crockett produced a blank lease, stating that it was the form used, and that plaintiff read this form over and was satisfied with it. That Crockett also explained that the leases were on deposit in the bank subject to the terms of a certain written contract. That Crockett furnished plaintiff with an instrument which he said was a copy of the contract, and that plaintiff read and examined the instrument and took away with him from Yale said blank lease and copy of the contract. That in a general way it was proposed by said Crockett to turn over leases upon four eighty (80) acre tracts, of which a choice was offered, upon condition that a well be put down 3,000 feet on one of said leases, the same to commence within a limited time. That after the plaintiff and said Crockett had fully discussed said proposition, during which time defendant had taken no part in the conversation, Crockett said to the plaintiff, in substance or effect: 'Well, what do you say; you can handle the matter?' To which plaintiff responded in substance: 'I don't know; I am favorably impressed, but we will have to go back to Guthrie to see what we can do. I don't know whether we can raise the money or not.' Plaintiff also said that he hadn't talked the matter over with anyone at Guthrie and didn't know whether Mr. Cassidy had or not. Mr. Cassidy then said, in substance or effect, that he had not, concurring with the suggestions of plaintiff that they would have to return home and see what they could do. That Mr. Crockett then said that the time was getting short and that they intended to have a well put down on the leases in some way as they considered the leases valuable and that he would desire to know at an early day whether the proposition could be handled, and that he would want to get up a contract covering the proposition. That the parties then started to leave the room, when Crockett remarked, in substance or effect, 'By the way, in whose name shall I make this contract?' To which plaintiff responded, in substance or effect, 'We have not discussed that matter, but just make it in the name of Mr. Cassidy.'

"(8) That early the next morning plaintiff and defendant started back to Guthrie; that on the way plaintiff and defendant discussed the possibility of handling the proposition, and also talked over persons who

might be interested to go into it; that plaintiff wrote out a list of names of persons who it was thought might be interested in the matter, some names being suggested by plaintiff and some by defendant, and some perhaps, by Mr. Fitzpatrick, a son-in-law of the defendant, who was on the train coming back from Fallis. That said parties arrived in Guthrie about ten o'clock on Saturday the 4th of April. That plaintiff left the train when it stopped at the M., K. & T. depot before pulling up to the Santa Fe station, this point being nearer to the home of plaintiff. That as plaintiff was leaving the train, defendant said, in substance or effect. 'Study this matter over and see if you can figure out some plan upon which we can handle it.' And plaintiff said he would do so. Plaintiff asked defendant if he would be down to plaintiff's office that day, and defendant said he did not know; that he was tired and had had very little sleep and might not be down. Plaintiff said: 'Well, I will see you then Monday morning.' To which defendant responded: 'Yes.' That plaintiff paid all his own expenses on this trip, including his share of automobile hire, and also his expenses in connection with all other things done by him. That defendant did not come to plaintiff's office on Saturday, but that on Saturday night plaintiff called defendant over the phone at his home, and stated to defendant that he, plaintiff, had been studying the matter over and had figured out a plan. Defendant responded: 'What is it?' To which plaintiff responded: 'We'll organize a company with $20,000 stock, with $1,500 promotion stock. 500 to you, 500 to me, and 500 to Gould.' To which defendant replied: 'That's all right.' Plaintiff then said. 'I guess I'll see you Monday morning.' and defendant said 'yes.' The court finds that by the terms of said conversation over the phone it was understood and agreed between said parties that said matter would be handled as stated in said conversation and as found above and that there was to be $1,500 of so-called promotion stock, which was to be divided between plaintiff, defendant Cassidy, and the said C. M. Gould.

"(9) The court further finds that on Monday morning, just before train time, defendant Cassidy came to plaintiff's office with his grip and informed plaintiff that he, defendant, was going to Oklahoma City. Plaintiff then said: 'Well, I'll look around here and see what we can do in Guthrie.' That as defendant was about to leave the office plaintiff said: 'In offering the stock for sale, we'll have to mention about that promotion stock.' To which, after a moment's reflection, defendant Cassidy said: 'Make that two thousand.' To which plaintiff responded: 'I guess it will carry that all right.' That defendant then went to Oklahoma City and plaintiff went out in Guthrie to see what he could do there.

"(10) The court further finds that in Guthrie during the time when said parties were seeking stock subscriptions the defendant Cassidy talked with one J. A. Milne, one of the subscribers, and told Milne in said conversation that the promotion stock was to be divided between plaintiff, defendant Cassidy, Gould, and Dr. O'Hearn.

"(11) The court finds that Dr. O'Hearn was not interested in said matter in any way with said parties and was not to participate in the division of said promotion stock.

"(12) The court further finds that defendant returned from Oklahoma City, and the stock being all subscribed, it was arranged that plaintiff should prepare articles of incorporation of the company to be formed, and go to Oklahoma City the next day and obtain a charter; that plaintiff prepared articles of incorporation and went to Oklahoma City the next morning and the charter was taken out in the name of the Alice-Kathryn Oil Company, one of the defendants herein.

"(13) The court further finds that it was agreed between said parties and the corporation to be formed and formed as aforesaid that the leases and all rights acquired by and through the arrangements with Mr. Crockett should be assigned and turned over to the corporation, in consideration of which the corporation would issue and turn over therefor $2,000 in stock of the company, being the stock herein referred to as promotion stock. The court finds that the leases and rights acquired by the company under said arrangement were worth more than the company paid for them and that said leases and rights were a good, valuable, sufficient, and legal consideration for said stock, and that said leases and rights were worth more than the par value of said stock.

"(14) The court finds that said arrangement in regard to the transfer of the leases and rights was carried out, and that the plaintiff and the said J. R. Cottingham prepared the necessary entrys and record of the organization of the corporation, and did what was necessary to complete and perfect said organization. That at the first stockholders' meeting the defendant Cassidy was elected president, plaintiff Hornor, vice president, and J. R. Cottingham, secretary and treasurer.

"(15) The court further finds that said corporation at the time if its incorporation and at all times had full notice and knowledge of the arrangement by which the leases were to be transferred to the company in consideration of $2,000 of stock, and in all things ratified and confirmed the same, and the same was and is a valid and legal contract, agreement, and arrangement; that by the terms of said arrangement the corporation got and received full legal value for said stock and has and claims no interest in the

same. That said corporation, by its pleadings on file herein, claims no interest in said so-called promotion stock and stands ready and willing to issue the same to whoever the court may find is entitled to it.

"(16) The court further finds that the said company has held back $500 of the stock and still holds the same unissued, and has pleaded herein its readiness and willingness to issue said stock as may be found and determined by the court herein.

"(17) The court further finds that the plaintiff, C. G. Hornor, was and is the owner of $500 of said so-called promotion stock now unissued and in the hands of the company.

"The court further finds in this action that the plaintiff, Hornor, is the owner of any dividends in connection with said $500 of stock, and which go with and belong to the same."

Upon these findings of fact the court made the following conclusions of law:

"(1) That out of the arrangement found above a trust arose. That while the transaction was in the name of the defendant Cassidy, plaintiff's right, title, and interest therein was perfect and complete in equity, and that the interest of plaintiff in said enterprise was owned by him as perfectly and completely as if it had stood in his name, and that equity will protect said right and interest and enforce the same.

"(2) That in equity plaintiff is the owner of at least $500 of the amount of said so-called promotion stock, and that said stock is impressed with a trust in whosoever hands it may be or come, save only an innocent purchaser for value, and that equity will pursue and follow the said stock so impressed with a trust as aforesaid and seize upon and require the same to be surrendered and delivered to the plaintiff so as to join the legal title with the equitable title.

"(3) That it is the aim and purpose of equity to allow a complete and adequate remedy, and that where there is a choice of remedies, equity will give the one that is most complete and adequate.

"That the Alice-Kathryn Oil Company does not hold said $500 of stock as a purchaser or owner thereof, but holds it as trustee, chargeable with notice of plaintiff's right and title thereto. That the offer of said corporation to issue said stock in accordance with the finding and judgment of the court is tantamount to a tender of said stock into court, which said corporation had a right to do and make.

"(5) That plaintiff is the owner of the stock herein sued for and is entitled to a decree requiring and directing said corporation to issue and turn over and deliver to plaintiff said $500 of stock, together with all and any dividends pertaining thereto, and

thereupon to be fully acquitted and discharged from any further liability in the premises and also to recover its costs."

After the evidence had been introduced, the plaintiff, by leave of the court, filed an amendment to his petition in which he prayed for the recovery of six and two-thirds shares of stock instead of five shares as prayed for in his original petition.

Judgment was rendered for the plaintiff, decreeing that he was entitled to five shares of stock in the treasury of the defendant Alice-Kathryn Oil Company, together with all dividends accumulated thereon and held by said company, and directing said company to issue to the plaintiff five shares of stock, and deliver the same, together with the dividends accumulated thereon, to the clerk of the court to be by him held pending the final judgment upon appeal of said cause. It is this judgment of which the plaintiff in error complains, while defendant in error Hornor complains of the action of the trial court in refusing to award him the additional one and two-thirds shares of stock.

The first question presented for determination is whether or not the $500 of stock in the hands of Cassidy or Alice-Kathryn Oil Company was impressed with a trust in favor of Hornor.

Counsel for plaintiff in error contended that neither the leases assigned to Cassidy nor the contract by him executed with the Fortuna Oil Company were impressed with any trust in favor of Hornor, for the reason that there is no allegation in the pleadings and no evidence charging Cassidy with having committed any fraud against the rights of Hornor in making the contract with the Fortuna Oil Company or in assigning his rights therein and the leases obtained thereunder to Alice-Kathryn Oil Company for $2,000 of stock; that Hornor was fully informed of these acts at and before the time the same were done; that as no fraud on the part of Cassidy is shown, a constructive trust did not arise, and as Hornor paid no part of the consideration for the leases, a resulting trust did not exist.

We cannot agree with this contention. As we view the facts, they bring the cases clearly within the doctrine announced in Pomeroy's Equity Jurisprudence, vol. 1, page 155, where, in treating on constructive trusts, it is said:

"Constructive trusts are raised by equity for the purpose of working out right and justice, where there was no intention of the party to create such a relation, and often directly contrary to the intention of the one holding the legal title. All instances of constructive trust may be referred to what equity denominates fraud, either actual or constructive, including acts or omissions in violation of fiduciary obligations. If one party obtains the legal title to property, not only by fraud or by violation of confidence or fiduciary relations, but in any other unconscientious manner, so that he cannot equitably retain the property which really belongs to another, equity carries out its theory of a double ownership, equitable and legal, by impressing a constructive trust upon the property in favor of the one who is in good conscience entitled to it, and who is considered in equity as the beneficial owner. Courts of equity, by thus extending the fundamental principle of trusts—that is, the principle of a division between the legal estate in one and the equitable estate in another—to cases of actual or constructive fraud and breaches of good faith, are enabled to wield a remedial power of tremendous efficacy in protecting the rights of property."

This text was followed in Dike v. Martin et al., 85 Okla. 103, 204 Pac. 1106.

In our opinion the findings of fact by the trial court, which are fully sustained by the evidence, show that Cassidy and Hornor entered upon the joint enterprise of obtaining oil and gas leases in the vicinity of Yale, and that the relation existing between them was that of joint adventurers. When the contract was made with and the leases obtained from the Fortuna Oil Company, this was done for the benefit of all the parties to the joint venture, and it matters not that this contract was made in the name of Cassidy and the leases assigned to him, as the leases became the joint property of all the parties and Cassidy would be regarded as a trustee for his associates. 23 Cyc. 455. When the leases thus obtained were assigned to the Alice-Kathryn Oil Company in exchange for stock in said company, said stock became the joint property of the parties, and if issued to Cassidy, would have been held by him as trustee for his associates.

The relation between parties to a joint adventure is fiduciary in its character, and requires the utmost good faith in all the dealings of the parties with each other. 15 R. C. L. 501; Botsford v. Van Riper et al., 33 Nev. 190, 110 Pac. 705; Dike et al. v. Martin et al., supra.

When Cassidy refused to deliver to Hornor his proportionate share of the stock obtained for the leases, he thereby violated the fiduciary obligation resting upon him which required the utmost good faith in his dealings with his co-adventurer, and cannot equitably retain the fruits of the joint ad-

venture and deprive Hornor of the share thereof which rightfully belongs to him, and a court of equity will grant relief by requiring the issuing of the stock to the true owner.

It is next contended that the Alice-Kathryn Oil Company is prohibited by section 39, article 9, of the Constitution from issuing stock except for money, labor done, or property actually received to the amount of the par value thereof, and as Hornor does not claim that he performed services or labor for the corporation, he cannot recover.

Of course, if no consideration was paid for the stock in question, neither Hornor nor Cassidy would be entitled thereto, and if the stock had been issued without labor done or property actually received to the amount of the par value thereof, at least all stock issued in excess of the valre actually received would be void, but no contention whatever is made that the company has not received full value for the stock in controversy. While the stock is referred to as promotion stock, it is not such stock in reality, but is stock paid for in full with property actually received, viz., the oil and gas leases assigned to the company by Cassidy, and, as we have already seen, Hornor owned an interest in these leases, the same being held by Cassidy in trust, and when Cassidy exchanged the leases for the stock, the interest of Hornor attached to the stock.

The corporation claims no interest whatever in the stock, it has been paid therefor, and so far as it is concerned the stock should, as between Cassidy and Hornor, be treated as already issued. We fail to see where the constitutional provision relied upon in any manner prevents Hornor from recovering the property to which he is clearly entitled.

It is further urged that Hornor concealed from the stockholders and board of directors of the Alice-Kathryn Oil Company the fact that he had an agreement with Cassidy by which he was to receive a part of the promotion stock, and thereby estopped himself from recovering either as to the corporation or Cassidy.

It appears from the evidence that Hornor did not conceal from the other stockholders the fact that he claimed an interest in the leases, and it was well known by the stockholders that the corporation was to issue $2,000 of its stock for the leases. Neither the corporation nor any of the stockholders thereof are complaining because of the price paid. Hornor and Cassidy had not conspired to cheat or defraud the corporation, and did not defraud it, and the fact that Hornor was a director in the corporation did not render the contract by which the stock was exchanged for the leases void per se, but such contract, at most, was merely voidable at the option of the corporation. 10 Cyc. 809. As the corporation is not complaining, the validity of the contract is not in question.

The Alice-Kathryn Oil Company makes no claim to the stock in controversy and by its answer expressed a willingness to issue the same to the party decreed to be entitled thereto. It has not appealed from the judgment decreeing Hornor to be the owner and directing that the stock be issued to him, but is satisfied with the judgment, and no reason appears why the judgment should not be carried out.

The defendant in error does not vigorously contend for the one and two-thirds shares of stock, and as he proceeded from the beginning upon the theory that he was entitled to but five shares, and the lower court so found, we are not inclined to disturb the judgment of the trial court, but such judgment is in all respects affirmed.

JOHNSON, McNEILL, MILLER, and KENNAMER, JJ., concur.